# CASES

## ARGUED AND DETERMINED

### IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS AND THE CIRCUIT AND DISTRICT COURTS.

---

LAND TITLE & TRUST CO. v. ASPHALT CO. OF AMERICA. HARRITY et al. v. NATIONAL ASPHALT CO. LAND TITLE & TRUST CO. . v. TATNALL et al. EQUITABLE TRUST CO. v. SAME.

(Circuit Court of Appeals, Third Circuit. December 18, 1903.)

No. 30.

**1. CORPORATIONS—DEFAULT IN PAYMENT OF BONDS—RIGHT OF TRUSTEE TO FORECLOSE.**

A trust company, as trustee for the bondholders of a corporation, had in its possession a fund on which it was authorized to draw for paying interest on the bonds in case of default by the corporation, which was in such case bound by its agreement to replace the sum so withdrawn within a year. The trustee made two interest payments from the fund, and they were not restored by the corporation, which was in fact insolvent. *Held*, that the trustee was justified in foreclosing the security it held for the bondholders, and was not bound to wait until the fund was exhausted.

**2. SAME—POWERS OF TRUSTEE—CONSTRUCTION OF TRUST AGREEMENT.**

Where an agreement pledging securities to a trustee to secure payment of bonds by a corporation provided that in case of its default the trustee might institute such legal proceedings as might be advised by counsel, the trustee was entitled to maintain a suit in equity to foreclose and have the securities sold by order of the court, notwithstanding another provision giving it a power of sale.

**3. SAME—INSOLVENCY—DISCRETION OF COURT TO DIRECT SALE OF ASSETS.**

Where the receivers appointed for a corporation on the ground of its insolvency, who represented both creditors and stockholders, without fraud or collusion refused to oppose an application by the trustee for its mortgage bondholders to have all of its mortgaged assets sold and applied to the payment of the mortgage debt, deeming such action for the best interest of all concerned, and the court decreed such sale, its action will not be set aside on objection of a single stockholder on the ground that there had been no such default as to render the principal of the debt collectible when two of the five defaults alleged were admitted to be true defaults, and to a large amount, and justified the proceeding by the trustee of the mortgage.

**4. SAME—FORECLOSURE SUIT—INTERVENTION BY STOCKHOLDERS.**

Allegations in a petition of intervention sought to be filed by a stockholder of an insolvent corporation in a suit by the trustee for its bondholders to foreclose *held* insufficient to charge the complainant with fraud or conspiracy.

127 F.—1

**5. SAME.**

A court of equity, having possession, through its receivers, of the property of an insolvent corporation, is not required to permit a stockholder to intervene in a foreclosure suit brought by the trustee for its bondholders for the purpose of requiring the trustee to enforce the liability of the stockholders for unpaid installments on their stock, instead of foreclosing its security. The court in such case has full power to order calls made on the stockholders if, in its judgment, such action is for the best interest of the creditors and stockholders; but its discretion is not subject to control by individual stockholders, nor is it required to permit them by interventions to interfere with its administration of the property.

**6. SAME—MORTGAGE—RIGHT OF TRUSTEE TO FORECLOSE.**

The right of the trustee for mortgage bondholders of a corporation to foreclose and sell the security on default by the corporation cannot be affected by the fact that the corporation has power to make calls on its stockholders for unpaid installments which power it fails or refuses to exercise.

**7. SAME.**

The fact that foreclosure proceedings against a corporation which is admittedly insolvent were instituted by the mortgage trustee at the instance of a committee representing a majority of the bondholders and also of the stockholders, who desired such action in furtherance of a plan of reorganization, is not sufficient to sustain a charge of conspiracy or fraud against the trustee made by a minority stockholder.

**8. SAME—FORECLOSURE SUIT—PROOF OF CLAIMS.**

Where the entire bonded indebtedness of an insolvent corporation was proved in a suit to foreclose by the trustee in its own name, for the benefit of all of its certificate holders, as was proper under the trust agreement, it was not error for the receivers or the court to refuse to receive proof of the claim of an individual certificate holder.

**9. JURISDICTION OF FEDERAL COURTS—SUBJECT-MATTER OF SUIT—REMEDY GIVEN BY STATE STATUTE.**

Section 65 of the New Jersey corporation act (Laws 1896, p. 298), which authorizes a suit by a creditor or stockholder against any corporation which shall have become insolvent or suspended its ordinary business for want of funds to carry on the same, to enjoin the corporation, its officers and agents, from exercising any of its privileges and franchises or transferring its property and for the appointment of a receiver, creates a right which may be enforced by a suit in a federal court having jurisdiction of the parties on its equity side, but such court will follow its own equitable procedure in granting the substantial relief given by the statute.

**10. APPEALABLE ORDERS—DENYING LEAVE TO INTERVENE.**

An order denying the application of one not a party for leave to intervene when discretionary with the court is not an adjudication of any substantive right, and is not a final order from which an appeal will lie.

**11. SAME—DISCRETIONARY ORDERS.**

An order refusing to entertain an appeal from the decision of receivers with reference to proof of a claim before them, where it was discretionary, and did not deprive the claimant of any substantial right, is not appealable.

Appeal from the Circuit Court of the United States for the District of New Jersey.

See 114 Fed. 484, 121 Fed. 192, 587.

Nathan Byers, for appellant.

Julien T. Davies, A. H. Wintersteen, and John G. Johnson, for appellees.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

GRAY, Circuit Judge.   These appeals were taken as follows from:

(1) The decree or order of April 3, 1903, denying the appellant's petition for leave to intervene in the foreclosure suit against the Asphalt Company of America, the third of the above-entitled causes, as a stockholder of that company, and to defend the same.

(2) The decree or order of July 6, 1903, denying the appellant's petition, appealing from the determination of the receiver, in the above consolidated cause, not to include in his report, filed June 4, 1903, petitioner's claim as a holder of a collateral gold certificate issued by the Land Title & Trust Company to him as trustee of the debt owed to it by the Asphalt Company of America, and for the security of which the said trustee held the stocks of certain constituent companies.

(3) The decree or order of July 20, 1903, denying the appellant's petition to intervene in the above-entitled consolidated cause, as stockholder and creditor of the Asphalt Company of America.

The statements of fact, so far as they are uncontroverted and disclosed by the records in these three appeals, and necessary to the understanding of the litigation out of which they grew, are, in outline, as follows:

The Asphalt Company of America, a New Jersey corporation, was organized in July, 1899, with an authorized capital of $30,000,000, represented by 600,000 shares of the par value of $50 each.   It was organized to acquire, and did thereafter acquire, the stock of certain other so-called "constituent companies," and caused to be given in exchange therefor, collateral gold certificates, amounting in the aggregate to $29,900,700 issued by the Land Title & Trust Company, as trustee, to which the Asphalt Company of America had theretofore conveyed, by way of pledge or mortgage, as security for said certificates, all of the said stocks of the said constituent companies, together with all income and dividends to be derived therefrom.   Said company also issued its entire capital stock, on each share of which $10 was paid.

On May 3, 1900, the National Asphalt Company was organized under the laws of the state of New Jersey, with an authorized capital stock of $15,000,000.   On August 15, 1900, its certificate of incorporation was amended; its capital stock was increased to $22,000,000, consisting of 440,000 shares of the par value of $50 each, of which 200,000 shares were preferred and 240,000 shares were common stock.   Pursuant to a proposal made by the said National Asphalt Company to the stockholders of the Asphalt Company of America, dated September 13, 1900, and accepted by the holders of a large majority of the stock of said company, 596,252 of its shares were duly acquired by the National Asphalt Company, according to the terms of said proposal.   In consideration of the premises, and of the obligations of the National Asphalt Company, under said proposal, a tripartite agreement was executed on December 31, 1900, between the Asphalt Company of America, the National Asphalt Company and the Land Title & Trust Company.   Under said agreement, the Asphalt Company of America deposited with its trustee, the Land Title & Trust Company, the $6,000,000 fund, representing its entire capital stock then paid in, being all of its assets not theretofore pledged by it under its conveyance of July 15, 1899, and the Land Title & Trust Company accepted the

deposit of said fund and agreed to apply it, under certain conditions, to the payment of interest on the collateral gold certificates, if not otherwise paid. The National Asphalt Company, by said agreement, pledged itself to replace any sums drawn from said fund, as set forth in its proposal, and the Asphalt Company of America agreed that it would replace, within one year from the time of such withdrawal, any sum thus withdrawn.

The Asphalt Company of America furthermore agreed in said tripartite agreement to pay $300,000 annually to the trustee, as a sinking fund for said collateral gold certificates, instead of a sum not less than $25,000 a year, and not to exceed $100,000 a year, as required by said instrument of pledge or mortgage of July 15, 1899.

Shortly after the proposal of September 13, 1900, to wit, on or about November 1, 1900, before the execution of the tripartite agreement, the appellant filed a bill of complaint in the Court of Chancery of the state of New Jersey, seeking to enjoin the carrying out of said proposal, and made a motion for a temporary injunction. The court, after hearing, denied him the relief asked for. From this decree, no appeal was taken.

On or about January 1, 1901, the said Asphalt Company of America paid to the said trustee under the tripartite agreement for sinking fund purposes, $300,000.

On the 1st day of April, 1901, by the terms of the agreement dated July 15, 1899, the Asphalt Company of America became bound to pay to the Land Title & Trust Company, for the benefit of the holders of the said collateral gold certificates, the sum of $745,768.86, as a semiannual installment of interest, and in case of default by the said Asphalt Company of America, by virtue of said agreement of December 31, 1900, the National Asphalt Company became bound to pay to the said The Land Title & Trust Company, trustee as aforesaid, for the benefit of the holders of said collateral gold certificates, the said amount of $745,768.86. Neither the said Asphalt Company of America nor the said National Asphalt Company made payment to the said trustee on account of this obligation, and accordingly the said trustee, on the said 1st day of April, 1901, appropriated from the fund of $6,000,000 deposited with it under and pursuant to the said last-mentioned agreement, the sum of $745,768.86, and applied the same to meet the semiannual payments then due on said collateral gold certificates. It is alleged that $560,000, on account of this payment due April 1, 1901, was afterwards paid by the Asphalt Company of America to the Land Title & Trust Company, leaving unreimbursed the sum of $185,768.86, taken out of the $6,000,000 guaranty fund, which remains unpaid.

On October 1, 1901, the Asphalt Company of America, by the terms of said mortgage agreement of July 15, 1899, became bound to pay to the said The Land Title & Trust Company, for the benefit of the holders of the collateral gold certificates, the sum of $745,768.86, but default was made in said payment, and the said National Asphalt Company, which thereupon became bound to pay the same upon its guaranty, also defaulted, and no part of the same has since been paid by either the Asphalt Company of America or by the National Asphalt Company. Accordingly, the Land Title & Trust Company,

under the terms of the tripartite agreement of December 31, 1900, appropriated from the fund of $6,000,000 deposited with it, pursuant to said last-mentioned agreement, the sum of $745,768.86, and applied the same to meet the semiannual payments then due upon said collateral gold certificates. The Asphalt Company of America thereupon became bound to replace and repay to the said The Land Title & Trust Company, within one year from October 1, 1901, with interest, said sum of $745,768.86, appropriated as aforesaid to meet the said semiannual payments upon said collateral gold certificates. This it has hitherto failed to do.

December 28, 1901, the Land Title & Trust Company, being a corporation organized under the laws of the state of Pennsylvania, filed its bill of complaint in the Circuit Court of the United States for the District of New Jersey, against the Asphalt Company of America, as a corporation organized under the laws of the said state of New Jersey.

After asserting the organization of the Asphalt Company of America, its issue of stock and the creation of the trust in the Land Title & Trust Company, for the purpose of securing the payment of the principal and interest of the collateral gold certificates, as hereinbefore stated, and the organization of the National Asphalt Company, and its acquirement under its proposal of 596,252 shares of the Asphalt Company of America, out of a total issue of 600,000 shares, and the provisions of the tripartite agreement above referred to, alleges the defaults of the said Asphalt Company of America as above stated, and that in consequence thereof, it was subject to the following liabilities due or shortly to mature, for which it is directly liable:

Due to said complainant for the replacement of money withdrawn from the $6,000,000 guaranty fund, on April 1, 1901, under and pursuant to the sixth clause of the agreement dated December 31, 1900, without computation of interest..........$ 185,768 86
Due to said complainant, as trustee, to replace money withdrawn from the $6,000,000 guaranty fund, on October 1, 1901, under and pursuant to the sixth clause of the agreement of December 31, 1900, without computation of interest................. 745,768 86
Due to said complainant, as trustee, on account of the sinking fund payment upon the Collateral Gold Certificates of the Asphalt Company of America, maturing January 1, 1902, as provided in clauses 4 and 7 of the agreement dated December 31, 1900 .......................................... 300,000 00

Total ..........................................$1,231,537 72

In addition to the above, the bill avers that, by reason of the agreements and collateral gold certificates above mentioned, the Asphalt Company of America is subject to future and contingent liabilities of large amount, the extent of which cannot be precisely estimated. It is also averred that the Asphalt Company of America had other liabilities outstanding, consisting of bills payable and due to companies in which the said Asphalt Company of America is interested as stockholder, and also accounts payable to said companies, the aggregate of which exceeds $650,000.

The insolvency of the said Asphalt Company of America is averred, and that it is without funds to meet its obligations as afore-

said. By reason thereof, the bill avers that the directors of said company are prohibited by the laws of New Jersey from selling, conveying, assigning or transferring any of its estate, effects, choses in action, goods, chattels, rights, credits, lands or tenements. "That on account of the nature of the business of said Asphalt Company of America, and character and amount of its assets and liabilities, it is impossible for the board of directors of said corporation to take any steps to satisfy the claims of any of its creditors, or to protect the interests of its stockholders, or in any manner to administer its business without selling, conveying, transferring, or assigning some of its property, and that by reason of the prohibition aforesaid, contained in the statutes of New Jersey, the directors of said corporation are, in effect, deprived of all power over its affairs, except for safe custody of its assets, until such time as the court shall direct the administration thereof by a receiver or receivers or trustees for that purpose appointed." That complainant, therefore, has filed its bill in behalf of itself and all other creditors of said Asphalt Company of America, who may come in, etc., having no adequate remedy at law for its grievances stated. It prays for equitable relief.

(1) That the said Asphalt Company of America may be decreed to be insolvent, and that a writ of injunction may issue out of and under the seal of the court, restraining the said corporation, its officers and agents, from exercising any of its privileges or franchises, or from collecting or receiving any debts, or from paying out or disposing of any of its funds, property, or assets, as prohibited by the said New Jersey statute.

(2) That the court appoint a receiver or receivers of said corporation, in behalf of its creditors and stockholders, according to the form of the statute of New Jersey in such case made and provided, with full power and authority to demand, sue for, collect, receive, and take into possession all the goods, chattels, rights and credits, and property of every description of the said corporation, with all the incidental powers ordinarily vested in receivers in like cases, and with full power and authority to exercise all right of ownership in respect to the shares of stock owned by and registered in the name of said corporation, and to collect and receive the dividends, income and profits therefrom, and to apply the same in accordance with the orders and decrees of the court.

"(3) That the rights of complainant and all other creditors of the said Asphalt Company of America may be ascertained, and that the court fully administer the fund in which complainant is interested, being the entire assets and income of said corporation, and for that purpose, marshal all its assets and ascertain the several and respective liens and priorities existing on each and every part thereof, and decree and enforce the rights, liens and equities of all the creditors of said Asphalt Company of America, as the same may be finally ascertained by them, upon interventions or applications of every such creditor or lienor." And further, for such other relief as the nature of the case may require, and as may be agreeable to equity.

On the 28th of December, 1901, the Asphalt Company of America, the defendant in the foregoing suit, appeared by its solicitors, and filed its answer to the bill of complaint of the Land Title & Trust Company, admitting all the averments of said bill; that it, the defendant, was insolvent, and was without funds to meet its obligations as they should respectively mature, and that the future and contingent liabilities of defendant were large, and recognized that in its insolvent position, it was prohibited by the laws of the state of New Jersey from making any application of its assets as a preferential payment on any of the obligations referred to in said bill, and that by reason of its said insolvency, its directors were prohibited by the laws of New Jersey from selling, assigning or transferring its property or assets, as in the said bill of complaint is set forth.

Defendant further joined in a prayer that a decree of insolvency be entered, and that a receiver be appointed by the court to take charge of its property and assets for the benefit of its creditors and stockholders. On the said 28th day of December, 1901, the court below, on the reading of the bill of complaint and affidavits in support of the same, and the answer of the defendant, duly filed, and the hearing of complainant's motion for an injunction and the appointment of receivers, made its interlocutory decree that, being satisfied with the sufficiency of the application of complainant, and of the truth of the allegations contained in said bill of complaint, a writ of injunction forthwith issue out of and under the seal of the court, restraining the said corporation, its officers, directors, agents or employés, from exercising any of its privileges or franchises, or from doing any of the things forbidden by the New Jersey statute above referred to, to be done. Also that receivers be appointed of all the property, real, personal and mixed, of the defendant, the Asphalt Company of America, wheresoever situated, and all its franchises, rights, privileges and effects, more particularly set forth in the decree, and with the powers and authorities usually conferred upon receivers in such cases, for the proper protection of the property and trusts vested in them. After the receivers had been appointed, as aforesaid, about January 27, 1902, the appellant, Harry C. Spinks, applied by petition for leave to intervene in the said suit, as recited by him in one of the petitions now before this court. The court denied this application, and no appeal was taken therefrom. 114 Fed. 484.

On December 8, 1902, the Land Title & Trust Company filed a bill, or petition in the nature of a bill, to foreclose the mortgage or pledge made to it by the Asphalt Company of America, to secure the collateral gold certificates, exceeding $29,000,000 in amount. This bill set up the defaults in the payment of obligations of the defendant company to the amount of $2,723,075.44, stating provisions in the agreements of July 15, 1899, and December 31, 1900, authorizing the resort by the trustee to the court for relief, demands upon the defaulted companies and the receivers thereof for payment of the defendant's debt, the continuance of such default, subsequent to such demands, and requests from holders of the collateral gold certificates,

(for which the securities held by the trustee were pledged) for proceedings to be taken in protection of their interests. All the averments of the bill were admitted by the receivers, in their answer, to be true. This admission by the receivers must be considered in the matter before us, as of important significance, as it is the admission made by officers of the court, appointed independently of the interests involved, and presumably after due inquiry and consideration of all the material facts alleged in the bill and proceedings under which said receivers were originally appointed. This answer was filed February 14, 1903. Prior thereto, to wit, January 2, 1903, Spinks, the appellant, states that he requested the said receivers in writing to set up, in answer to the bill of the Land Title & Trust Company, certain specified defenses fully set forth in the proposed answer and affidavits annexed to his petition for intervention, and that the receivers refused to set up said defenses. On January 14, Spinks filed, in the court below, a petition of appeal from the decision of the receivers not to adopt his proposed answer, and on the following February 13th, this appeal was dismissed by the court below, with an opinion, stating the reasons for so doing, (reported in 121 Fed. 192). More than a month after the filing of the answer of the receivers of the Asphalt Company of America, as hereinbefore stated, to wit, on March 18, 1903, the appellant filed a petition in the court below, for leave to intervene and answer the said bill of foreclosure of the Land Title & Trust Company, with the defenses already set out in his written request to the receivers January 2d, and also in his petition of appeal to the court below, from the decision of the receivers above referred to. Upon this petition for intervention, a rule was issued to show cause on March 30, 1903. This rule was accordingly heard, counsel on both sides appearing, and on April 3, 1903, it was ordered by the court that the prayer of said petition be denied. From this order, an appeal was taken by the petitioner, Harry C. Spinks, and will be referred to as the first of the appeals now before this court.

Prior to the filing of appellant's petition for intervention, to wit, February 16, 1903, an order was made by the court below, consolidating the four suits in the caption, in all of which the Land Title & Trust Company was asserting a prior lien on certain assets. On February 23, 1903, an order was made, referring the claim of the Land Title & Trust Company, in the consolidated suit, to a special master, to ascertain and report the amount of principal and interest of the collateral gold certificates of the Asphalt Company of America outstanding, and also the collateral gold certificates of the National Asphalt Company, and the amounts due and to become due thereon for semiannual payments, and to report and ascertain what securities are held by the Land Title & Trust Company and the Equitable Trust Company for the security of said certificates, in what manner they are pledged, and how they could be sold to the best advantage. On the coming in of the reports of the special master, first and supplemental, the court below, on April 3d, entered its decree of sale in accordance with the recommendations of said reports, directing publication of notice of sale, and that the receiver should publish notice to creditors of the Asphalt Company of

America to present their claims, etc. On May 14th, the appellant states that he filed with the receiver his proof of claim as a creditor of the Asphalt Company of America, which claim the receiver declined to report to the court, on the ground that the Land Title & Trust Company had filed a claim on behalf of all the outstanding collateral gold certificates, including those held by the appellant. On May 15th, sale was had of the pledged securities, pursuant to the decree, and on the 18th of May, decree was entered confirming said sale. The terms of sale were complied with prior to June 3d, and all the property included in the sale was invested in the General Asphalt Company. The report of the receiver of claims against the Asphalt Company of America, was filed on June 4th, and on June 15th, a decree was entered confirming said receiver's report, and directing distribution. On July 3d, Spinks filed in the court below a petition of appeal from the determination of the receiver not to allow his claim as a creditor of the Asphalt Company of America, and on July 6th, said petition was dismissed by that court. From the order dismissing the petition, an appeal has been taken to this court, and will be referred to as the second of the appeals now before us.

On July 20, 1903, Spinks filed a petition to intervene in the consolidated cause, and set aside the decree of sale and decree confirming sale, which petition was heard, and the petition to intervene in the consolidated cause denied by the court below. From the order denying the petition to intervene, an appeal has been taken here, and will be referred to as the third of the appeals now before this court.

With this general statement of the character of the litigation involved in the consolidated suits, we come to consider the merits of those appeals and the questions of law involved therein. The first and third appeals may be considered together, the one relating to the petition to intervene in the so-called foreclosure suit, and the other to the petition to intervene in the consolidated cause preferred to the court below after the sale under the decree, and seeking to set aside the decree of sale and the decree confirming the sale.

In the first appeal, the appellant represents himself as having filed his petition to intervene in the foreclosure suit in the court below, as the holder of 1,000 shares of the capital stock of the Asphalt Company of America, out of a total of 600,000 shares. The so-called foreclosure bill was filed November 18, 1902, by the Land Title & Trust Company, as trustee of the securities conveyed to it by the Asphalt Company of America, for the benefit of the holders of the collateral gold certificates issued by it as above described. The allegations of the bill heretofore briefly outlined, including the allegation of the default to the amount of $2,723,075.44, were necessarily considered and investigated by the receivers, as appears by their answer filed February 14, 1903. That these allegations were carefully considered and investigated, is emphasized by the statement of the appellant in his petition for intervention, that he had applied to the said receivers before the filing of the answer, to wit, on January 2, 1903, to include in their answers certain defenses set out by him, and that the receivers, after presumably considering the same, had declined to adopt the answer proposed by appellant, and that thereafter, to wit, on January 14, 1903, the said ap-

pellant filed a petition of appeal to the court below from the decision of the receiver not to adopt the proposed answer. This appeal, as already stated, was on February 13th dismissed by the court below, with an opinion published in 121 Fed. 192, and it was not until after the request to the receivers to file his proposed answer, their refusal, and the dismissal by the court below of his appeal from their decision, that the receivers filed their answer, as defendants in the so-called foreclosure suit, admitting all of its substantial allegations of default, and otherwise. In the said petition of appeal to the court below from the receiver's refusal to adopt appellant's answer, the defenses proposed in said answer are set out at length, and the court asked to instruct the receivers to incorporate the same in the answer to be filed by them. In the first appeal, therefore, to this court, now under consideration, from the refusal of the court below to so instruct the receivers, we are asked to consider the merits of appellant's proposed defenses.

In the view taken by this court of these appeals, it will be necessary to consider only briefly the character of these proposed defenses. They are six in number, and are set out with much elaboration in the petition of intervention in the court below.

The first of these defenses is, that the allegations of the bill of complaint, as to the defaults of the American Company, are not truly pleaded, in that, of the five defaults alleged, only two were defaults as to valid obligations of the Asphalt Company of America, and that there was, therefore, due only the sum of $1,491,537.72, instead of $2,733,-077.54. The three defaults which are impeached, arise out of the failure of the company to meet the obligations imposed upon it by the tripartite agreement of December 31, 1900. Without passing upon the question as to these being defaults of a character to justify the proceeding of the trustee, it is sufficient to note that two of the defaults of a large amount are admitted to be true defaults in relation to the pledge or mortgage, and justify the trustee in its proceeding for foreclosure.

As a second defense, the appellant alleges that the trustee might have applied the balance of the $6,000,000 guaranty fund that it had received under the tripartite agreement of December 31, 1900, to the settlement of the defaults, on account of which the so-called bill of foreclosure was filed. But, according to the appellant's own statement, it had already twice withdrawn the sum of $745,768.86 from said fund to pay installments of interest on the collateral gold certificates, due respectively April 1, 1901, and October 1, 1901. Under the terms of the tripartite agreement, the authority given to the trustee to resort to this fund for payment, was coupled with the obligation of the Asphalt Company of America to replace, within 12 months, any sums thus withdrawn from said fund. (The failures on the part of the Asphalt Company of America to replace these sums are the defaults alleged in the so-called bill of foreclosure, to which appellant takes exception, as above stated.) But clearly the trustee was not required, either by the obligation of its trust or the requirements of good business management, to go on drawing from this fund, when both the Asphalt Company of America and the National

Asphalt Company had failed to make good the amounts withdrawn, and when it had no reasonable grounds to believe that their situation in that respect would be better in the future. To have exhausted this fund, even if it had been an available cash fund, by the withdrawal of sums to meet these semiannual payments, might have postponed for three or four years a technical default which the trustee and those interested might well have thought would better be made and dealt with at once by a foreclosure. The trustee was justified in dealing with the default of the Asphalt Company of America, as provided for in the original deed of conveyance and pledge to it, and was not bound to exhaust the said guaranty fund, when to do so would, in its judgment, be to the detriment of the best interests of all concerned.

The third defense which the appellant sought to interpose by his petition of intervention, was that the bill of complaint was prematurely filed, on the ground that the mortgage or instrument of pledge provided that, after a default made and continued for thirty days after demand, the trustee, upon the request of a majority of certificate holders, shall cause the pledged securities to be transferred into its name, and that if, within six months thereafter, the company has not made good the default, and a majority of the certificate holders shall demand that the pledged securities be sold, the principal shall be deemed due; and if within three months thereafter, the company has not paid the principal and interest due, the trustee shall sell the securities and apply the proceeds to the payment of the debt. The appellant alleges in his proposed defense, that the bill of foreclosure does not allege that any of these steps have been taken, or that ten months have expired since the occurrence of the alleged defaults. These particular provisions of the original mortgage are set out at great length therein, and provide for the eventual sale by the trustee, of his own motion, of the pledged securities after all these steps have been taken, and the prescribed periods of time mentioned have expired. The directions as to the making of the sale and the notices to be given at the different stages of the procedure mentioned, are most minute. After they have been completely described, there follows in another paragraph this provision:

"The trustee may, in the event of default made and continued, as provided in this section of the agreement, at the request in writing of the owners and holders of a majority in amount of the certificates at the time outstanding, institute such legal proceedings as may be advised by counsel to enforce the obligations of this agreement undertaken by the company."

The court below may well have considered this provision as an alternative power in the trustee to proceed, when the default on the part of the company in payment of an installment of interest had continued for 30 days, in lieu of the power of sale vested in the trustee when and after so many different requirements had been complied with. Such default for 30 days is the only default on the part of the company mentioned in the preceding provisions, and the trustee would seem to have been authorized, at the request in writing of the owners and holders of majority in amount of the certificates outstanding, to institute such legal proceedings as might be advised by

counsel to enforce the obligations undertaken by the company. The defaults are alleged to have occurred on April 1 and October 1, 1901, and the foreclosure proceedings were commenced December 18, 1902. By so doing, the trustee, instead of exercising its own powers of sale under the provisions of the mortgage referred to, submitted to the court in control of the assets, the question in what manner it should enforce its securities so as to best promote the interests of the creditors, and asked the court to take order for the sale of all the securities, both those originally pledged for the debt and those subsequently acquired for the same debt.

The fourth defense sought to be interposed by the appellant, was that the trustee had no right to ask for a sale of all the assets pledged with it, nor for the payment of the principal of the bonds in addition to the interest. The receivers in this case represented the interests of all the stockholders, after the payment of the debts, and the conclusion reached by them not to interpose such defense, apart from fraud, cannot be questioned by each individual stockholder, and there is nothing to impeach the discretion of the court below in having ordered a sale of all the assets at the instance of the complainant trustee, who represented the creditors of the insolvent company.

The fifth defense rests upon general and broad allegations of a conspiracy to wreck the Asphalt Company of America, participated in by the trustee and a majority of the certificate holders, at whose request the trustee filed the bill. This charge of conspiracy is also the burden of the petition for intervention filed in the consolidated cause, after the decree of sale and the decree confirming the sale, asking the court to set aside all that had been done and investigate the said charges. This latter petition was filed by the appellant, both as stockholder and certificate holder. No specific and definite charges of fraud and conspiracy are averred, and the Land Title & Trust Company, as trustee, are at best only sought to be affected by a suspicion of complicity in a so-called conspiracy arising out of the fact that about one year after the formation of the Asphalt Company of America, only $10 a share having been paid upon its stock, a large majority of its stockholders, pursuant to a plan theretofore outlined to the National Asphalt Company, transferred to the National Asphalt Company their stock in the Asphalt Company of America, receiving in exchange for each share of the par value of $50 thus transferred, $10 in 5 per cent. collateral gold certificates of the National Asphalt Company, $7 in full-paid and nonassessable National Asphalt Company's preferred stock, and $10 in full-paid and nonassessable National Asphalt Company's common stock. The National Asphalt Company's gold certificates were secured by a deposit with the Equitable Trust Company of Philadelphia, as trustee of all the shares of stock of the Asphalt Company of America purchased under this plan.

The inference is asked to be drawn from this transaction (the charge not being directly made) that this transfer by nearly all of the stockholders of the Asphalt Company of America, of their stock to the National Asphalt Company, was in pursuance of a scheme or conspiracy to relieve said stockholders from liability to be called upon for the unpaid installments due on their stock; it being alleged that the

National Asphalt Company was without pecuniary responsibility, and that many of the stockholders of the Asphalt Company of America were also holders of its collateral gold certificates.   None of the alleged facts, if proven, would impugn the good faith of the Land Title & Trust Company, as trustee, and it is hard to imagine why a complaining stockholder should have the right to interfere in the administration of its trust for the collateral gold certificate holders, because of his difference with the other stockholders.   But it is alleged by the appellant, that the unpaid installments could have been availed of, if proper calls had been made, to discharge all the indebtedness of the Asphalt Company of America, and prevent the insolvency that has ensued.   But in case of insolvency, no stockholder can be made liable to call for the benefit of a fellow stockholder.   The stockholder's liability to creditors may be prosecuted by the receivers.   The Land Title & Trust Company, as trustee, was, it is true, creditor of the Asphalt Company of America, to the full amount of the gold certificates, but it cannot be arraigned by the appellant in the intervention sought by him for a dereliction of duty.   Whether the trustee should or should not have pursued the stockholders for unpaid installments, its right to make good the securities it held in pledge for the holders of its certificates cannot be affected thereby.   No corporation mortgage could be successfully foreclosed by the trustee, proceeding under the authority contained in the mortgage, if each stockholder or bondholder were allowed to intervene in the litigation on the grounds presented in these two appeals.

It is not to be overlooked that the so-called foreclosure suit was in reality a proceeding by the trustee to have the court, which already, under the original suit had taken possession, through its receivers, of the property and assets of the Asphalt Company of America and the National Asphalt Company, apply the same in discharge of the lien held by the said trustee.   And the subsequent action of the court, its reference to a master and its order of sale and confirmation thereof, were all steps in the due administration by it of the fund in its possession.   All that ought to have been done by the corporation itself, the court can, in the exercise of a sound discretion, require to be done through the instrumentality of its receivers. Upon the proper exercise of that discretion depends the large and widespread interests of stockholders, creditors, and the public, and the court may well have refused to have the progress of its administration interfered with by would-be interveners, on grounds that are technical rather than meritorious, which, while destructive of the main object had in view, and disastrous to the larger interests involved, promise no real benefit or advantage to the intervener.   As we have said, the court having possession and plenary control of the funds and assets of the insolvent corporation, may order its receivers, under proper conditions, to proceed for the enforcement of a stockholder's liability, but this power will only be exercised when, in the discretion of the court, it is likely to produce results beneficial to all the interests involved.   It is well to recall that the appellant filed a bill in chancery, in New Jersey, in the fall of 1900, at the time that the transfers of stock referred to by him were made, and attempted to

prevent his fellow stockholders from selling their shares to the National Asphalt Company. The vice chancellor denied this petition, and his reasons for so doing, as quoted by counsel from what is said to be a manuscript opinion in the case, are worthy of note:

"The bill is based upon a theory of the nature of the stockholders' liability under our statute which is not only new, but which, it seems to me, is at variance with the statute and decisions on it. It is apparently based on the idea that from the time of the creation of his debt every creditor has an existing and continuing right to the security of the calls for unpaid subscriptions for the payment of his debt and a right to hold this security of the calls as it existed when his debt was contracted, unimpaired during the continuance of his debt by a transfer of stock to an irresponsible person. The nature of the right shown by the statute itself and decisions under it is, on the contrary, only a right upon an administration of all the assets of the company for the payment of debts to have the unpaid shares then paid up so far as necessary to pay the debts then existing. * * * This right to make calls upon the unpaid subscriptions for the purpose of payment of debts is not a continuing security which the company are bound to keep unimpaired by control over the personnel of membership of the corporation, but is a right given only as supplemental of the result of the final winding up of the corporate affairs, and, in connection therewith, against persons who, at the time of the winding up, are liable as stockholders under the statute."

But we are not concerned here to determine the liability of stockholders who have transferred their stock. The agreement between the Asphalt Company of America and the Land Title & Trust Company, as trustee, by which certain stocks and property were pledged for the security of gold certificates, to be issued by said trustee, and which the court, in the litigation below is asked to foreclose, was made in July, 1899, and the transfer by the stockholders of their stock to the National Asphalt Company, took place in September, 1900. It was the right and duty of the trustee under the so-called mortgage or pledge to foreclose the same, when default had taken place, whether the company be solvent or insolvent, and it is not material to the trustee what remedies the company may have to collect money with which to pay the mortgage debt. No conduct of stockholders, however reprehensible, could impair the remedy of the holders of certificates and of their trustee to enforce their security.

As we have already said, the vague and indefinite charge of a conspiracy, in which the trustee under the so-called mortgage was implicated, was not sufficiently specific to justify the court in arresting further proceedings in the important litigation before it, or in setting aside the order of sale, and sale already made, in order to investigate the said charge. Moreover, such a charge is not the subject for a collateral proceeding, and should be investigated in an independent suit instituted for that purpose.

The third petition of intervention charges that, in furtherance of said conspiracy, a certain number of stockholders, called in said petition "reorganizers," had caused a committee to be formed, at whose instance and by whose advice the bill for a receivership was filed and the subsequent proceedings of foreclosure and sale were taken. This committee, who are named in the petition, consisted of five well-known citizens and financiers, against whom no individual or specific charge of fraud is made. They are alleged, however, to

have had knowledge of the transfer of the stock by the majority of the stockholders, and to have assisted in formulating the plan of reorganization which necessitated the proceedings now under review before this court. It appears from the record that this so-called plan of reorganization was approved and participated in by the holders of 93 per cent. of the gold certificates, out of a total of $29,830,754.57 outstanding, and by the holders of 598,852 shares of stock out of 600,000 shares outstanding. In addition to the facts of the said transfer of stock and of the formation of the said plan for reorganization, pursuant to which the proceedings were instituted, and the sales took place, there are no grounds for alleging fraud or conspiracy, except such as are founded upon the suspicions of the appellant. We cannot ignore the fact that, when large corporations become insolvent, it is usual for those interested as stockholders or creditors to seek a reorganization upon the foundation of a judicial sale, and that the interests of all concerned, both stockholders and creditors, can often be best subserved by such a course. Under such plans, it is usually necessary for the protection of the property, that arrangements should be made beforehand for its purchase, or at least for the protection of the interests involved at the sale. That a reorganization plan of this general character was resorted to by means of the litigation out of which these appeals grew, does not suffice to support the charges of conspiracy and wrongdoing made by appellant. The general corporation act of New Jersey, under which the defendant corporations were created, and which, so to speak, constitutes their charters, provides that whenever any corporation shall become insolvent, neither the directors nor any officer of the corporation shall sell, assign, or transfer any of its effects or assets whatsoever, and also that, whenever such corporations become insolvent or suspend their ordinary business for want of funds to carry on the same, any stockholder may, by petition or bill of complaint, apply to the Court of Chancery for a writ of injunction and the appointment of a receiver or receivers, and the court, being satisfied of the sufficiency of said application, may appoint receivers and grant an injunction to restrain the corporation and its officers from any exercise of its privileges or franchises. Under these provisions, the bill was duly filed by the Land Title & Trust Company against the Asphalt Company of America, which constitutes the first of the cases embraced in the consolidated cause, and upon hearing and after due consideration, the court appointed the receivers and granted the injunction as prayed for. As already stated, the appellant applied for leave to intervene in this suit, which application was denied by the court, and no appeal was taken. See 114 Fed. 484. The insolvency, therefore, of the corporation is not denied in any of the petitions now before the court, and the decree adjudging the corporation to be insolvent is not impugned. That the Asphalt Company of America was insolvent on the 28th day of December, 1901, when said decree was made, must be accepted as a fact and these appeals considered with reference thereto. We think the court, under the circumstances, were right in denying the petitions for intervention, which are the subject-matter of the first and third appeal.

The second appeal relates to the action of the court below, in sustaining the receiver's determination not to report to the court, as specifically allowed, the claim of the appellant as a creditor of the Asphalt Company of America. The appellant is the owner of 133 of the collateral gold certificates issued by the Land Title & Trust Company, under the agreement of July 15, 1899. The total amount outstanding of said certificates, as found by the master appointed by the court, and by the court in its decree of April 3, 1903, was $29,-830,754.57. About 2,000 persons hold these certificates. It was not contemplated by the court, nor necessary, that the receivers should have presented to them for allowance, certificates in the hands of individual holders, as the decree itself fixed the aggregate amount of them outstanding, and made it unnecessary for holders to prove their individual claims. The Land Title & Trust Company was not merely a trustee of property pledged or mortgaged to it, but was also the creditor of the Asphalt Company of America. The Asphalt Company of America acknowledged the sum total of its indebtedness to the said The Land Title & Trust Company, and conveyed to it its property and effects, in pledge to secure the same, the trustee issuing the gold certificates to the various holders to the aggregate amount already stated, and making them its cestuis que trustent for the payment of the interest and principal, when received from the debtor company. It was, therefore, the Land Title & Trust Company, as trustee, which was entitled, as creditor of the insolvent company, to prove the aggregate debt, including, of course, that part of it represented by the certificate held by the appellant. The decree of the court, of April 3, 1903, fixed the status of the holders of collateral gold certificates as holders thereof, in accordance with the agreement of July 15, 1899, between the Land Title & Trust Company and the Asphalt Company of America, to the amount in par value of $29,830,-754.57, and the holders of such certificates were therefore adjudicated to be entitled, through their trustee, as valid claimants secured by said agreement.

The contention of the appellant, that the direction to the receiver to receive proof of all debts and obligations of the Asphalt Company of America, entitled him to present his claim as a holder of collateral gold certificates, cannot be supported. The receiver allowed and reported upon no claims of holders of collateral gold certificates, and it does not appear that any application, other than that of the appellant, was made to him for that purpose. No good reason was shown why appellant's case should be segregated from that of 2,000 other holders, or that his security, as such holder, was in any way affected to his detriment by the decision of the receivers. The appellant became the owner of his gold certificates, subject to any limitations imposed by the form in which they were made; that is to say, the obligations entered into by the Asphalt Company of America, in and by said agreement of pledge, or by the said trustee. The company covenants in said agreement to pay to the trustee the moneys necessary to pay interest on the certificates as they fall due, and also certain sinking fund amounts, and it is the trustee only who has, by the form of such certificates, direct obligation to the certificate holder, and in the

said agreement of July 15, 1899, it is expressly provided that "any proceedings to enforce any covenant of the company herein contained by legal proceedings shall be in the name of the trustee for the benefit of all the holders of the certificates outstanding."

Section 78 of the corporation act (Laws 1896, p. 302, c. 185) referred to provides that "every such insolvent corporation, or any person aggrieved by the proceedings or determination of such receiver in the discharge of his duty, may appeal to the Court of Chancery, which court shall, in a summary way, hear and determine the matter complained of and make such order touching the same as shall be equitable and just." The appellant appealed to the court below from the decision of the receiver denying his claim to prove his individual certificate, and the appeal being heard by the court, it was, as already stated, dismissed. The appeal from this decision of the court is the second appeal before us. We see no grounds on which to criticise the action taken by the court below in the matter of this appeal. There was no hardship in denying appellant a status in the consolidated suit, which was neither claimed by nor accorded to any of the other certificate holders, and no substantial right of appellant was injured by said decision.

In the third appeal, an important question is raised by the denial of the appellant, that the Circuit Court of the United States had jurisdiction to entertain the suit of the trustee for the appointment of receivers of the Asphalt Company of America, on the ground of insolvency, either under the statute of the state of New Jersey, already referred to, or under the general equitable powers of courts of equity, as administered in England and this country. Both corporations, the Asphalt Company of America and the National Asphalt Company, were incorporated under the provisions of the general corporation act of the state of New Jersey. The sixty-fourth and sixty-fifth sections (page 298) of the said act, as contained in the Revision of 1896, are as follows:

"64. Whenever any corporation shall become insolvent or shall suspend its ordinary business for want of funds to carry on the same, neither the directors nor any officer or agent of the corporation shall sell, convey, assign, or transfer any of its estate, effects, choses in action, goods, chattels, rights or credits, lands or tenements; nor shall they or either of them make any such sale, conveyance, assignment or transfer in contemplation of insolvency, and every such sale, conveyance, assignment or transfer shall be utterly null and void as against creditors: provided, that a bona fide purchase for a valuable consideration, before the corporation shall have actually suspended its ordinary business, by any person without notice of such insolvency or of the sale being made in contemplation of insolvency, shall not be invalidated or impeached.

"65. Whenever any corporation shall become insolvent or shall suspend its ordinary business for want of funds to carry on the same, any creditor or stockholder may by petition or bill of complaint setting forth the facts and circumstances of the case, apply to the Court of Chancery for a writ of injunction and the appointment of a receiver or receivers or trustees, and the court being satisfied by affidavit or otherwise of the sufficiency of said application and of the truth of the allegations contained in the petition or bill, and upon such notice, if any, as the court by order may direct, may proceed in a summary way to hear the affidavits, proofs and allegations which may be offered on behalf of the parties, and if upon such inquiry it shall appear to the court that the corporation has become insolvent and is not about to

resume its business in a short time thereafter with safety to the public and advantage to the stockholders, it may issue an injunction to restrain the corporation and its officers and agents from exercising any of its privileges or franchises and from collecting or receiving any debts, or paying out, selling, assigning or transferring any of its estate, moneys, funds, lands, tenements or effects, except to a receiver appointed by the court, until the court shall otherwise order."

It is true that, independent of statutory authority, the general equitable jurisdiction of the United States courts does not extend so far as to entertain a suit by a creditor against a corporation, seeking the appointment of a receiver of its business and property and an injunction against the exercise of its corporate franchises, solely on the ground of insolvency. It is, however, well settled by adjudications of the Supreme Court and subordinate federal courts, that if a state legislature, by a valid law, create a right essentially equitable in its nature, prescribing a remedy for its enforcement substantially consistent with the ordinary modes of proceeding on the chancery side of the federal courts, no reason exists why it should not be pursued in a federal court of equity in the same form as it is in the state courts. Clark v. Smith, 13 Pet. 195, 203, 10 L. Ed. 123.

In Gormley v. Clark, 134 U. S. 338, 348, 10 Sup. Ct. 554, 557, 33 L. Ed. 909, the Supreme Court say:

"An enlargement of equitable rights by state statute may be administered by the Circuit Courts of the United States as well as by the courts of the state; and when the case is one of a remedial proceeding, essentially of an equitable character, there can be no objection to the exercise of the jurisdiction."

Under the Constitution and judiciary act, "Circuit Courts of the United States shall have original cognizance, concurrent with the courts of the several states, of all suits of a civil nature, at common law or in equity, where the matter in dispute exceeds, exclusive of interest and costs, the sum or value of two thousand dollars, * * * in which there shall be a controversy between citizens of different states." The tests of jurisdiction, exclusive of the amount in dispute, are, therefore, that there shall be (1) a "case" or "suit" of a civil nature, as those terms have been defined by the Supreme Court of the United States, (2) which is cognizable in a court of the state wherein the federal Circuit Court has territorial jurisdiction, and (3) that such suit shall involve a controversy between citizens of different states. When such conditions exist, such Circuit Court has authority to fully adjudicate the legal rights of the parties to such controversy, as they exist under the laws of the state, as fully as they could be adjudicated in the appropriate state tribunal of concurrent jurisdiction. In so doing, the federal Circuit Court is necessarily dealing with and adjudicating rights that exist under and by virtue of the laws of the state in which such Circuit Court has its territorial jurisdiction. The Constitution and laws of the United States provide an additional forum to that of the state, for the adjudication of suits involving controversies between citizens of different states, not a different law. Any party who has a right to come into the Circuit Court of the United States, finds a court clothed with plenary power to do justice according to law, as existing in the state wherein such Circuit Court is held.

Such courts, therefore, administer the law of that state, and it would be doing violence to our dual scheme of government, if it could be predicated of a right created by and existing under the laws of a state, that it could not be asserted and enforced in the Circuit Court of the United States, in the exercise of its concurrent jurisdiction as prescribed and limited by the Constitution and judiciary act. The Constitution imposes no limitation upon the class of cases involving controversies between citizens of different states, to which the judicial power of the United States may be extended; and Congress may therefore lawfully provide for bringing, at the option of either of the parties, all such controversies within the jurisdiction of the federal judiciary. Gaines v. Fuentes, 92 U. S. 10, 23 L. Ed. 524; Ellis v. Davis, 109 U. S. 485, 3 Sup. Ct. 327, 27 L. Ed. 1006.

But while the Circuit Courts are thus clothed with jurisdiction to administer the laws of the state in all suits involving controversies between citizens of different states, the procedure in such courts will be that pertaining to suits at common law or in equity, as such suits were distinguished at the time of the adoption of the Constitution, and whether the relief sought, or the right asserted, fall into the one category or the other, depends upon the distinction as existing at that time. If the right to be asserted or the wrong to be redressed present a case essentially equitable in its nature, it will be cognizable on the equity side of the United States Circuit Court having jurisdiction of the parties, if there be no plain, adequate and complete remedy at law as existing at the time referred to. While state legislation cannot directly enlarge or contract the jurisdiction of the federal courts, it can create rights that are justiceable in such courts, which, without such legislation, were not cognizable therein. It has been long well settled, that where a state law creates a lien, essentially of a maritime nature, it can be enforced in the federal court of admiralty having jurisdiction within such state, though such lien be not recognized under the general admiralty law. But the procedure for enforcing such lien will be that obtaining in courts of admiralty, not that provided by the state law. And the same result attaches to the provisions of the New Jersey corporation act, in the sections above referred to. The situation to which these provisions refer, presents a case essentially equitable in its nature and capable of being prosecuted and administered only by the procedure ordinarily obtaining in courts of equity. Hollins v. Brierfield Coal & Iron Co., 150 U. S. 371, 14 Sup. Ct. 127, 37 L. Ed. 1113. A suit under these sections of the act is, therefore, cognizable in the United States Circuit Court having jurisdiction of the parties on its equity side. The right so created will be enforced by the remedies prescribed by the act, so far as the same are consistent with and not violative of the general equitable rules and procedure, as administered in federal courts of equity. But such courts are not obliged to depart from their own rules and conform to the procedure prescribed by the statute, if such procedure is inconsistent with or unknown to the equitable practice obtaining in federal courts. Such courts may adapt their own equitable procedure to the adjudication of the right and the attainment of the relief established and prescribed by the state statute, when once on other grounds they

have jurisdiction of the case. The equitable right established by state law may be dissociated from the mere procedure prescribed by such law for its enforcement. The language of Mr. Justice Miller in Brine v. Insurance Co., 96 U. S. 634, 24 L. Ed. 858, though the facts of the case are somewhat different, is pertinent here:

"It would seem that no argument is necessary to establish the proposition that when substantial rights, resting upon a statute, which is clearly within the legislative power, come in conflict with mere forms and modes of procedure in the courts, the latter must give way, and adapt themselves to the forms necessary to give effect to such rights. The flexibility of chancery methods, by which it moulds its decrees so as to give appropriate relief in all cases within its jurisdiction, enables it to do this without violence to principle. If one or the other must give way, good sense unhesitatingly requires that justice and positive rights, founded both on valid statutes and valid contracts, should not be sacrificed to mere questions of mode and form."

The pursuing party in the receivership suit (the Land Title & Trust Company) was not a simple contract creditor, but was the pledgee or mortgagee of all, or nearly all, of the assets of the defendant company. As such lienholding creditor, it exercised the right and power conferred by the New Jersey statute to have an injunction, and a receiver appointed, by merely showing the insolvency of the debtor and defendant corporation and that it was not about to resume its business in a short time thereafter, with safety to the public and advantage to the stockholders. It is not necessary, therefore, to discuss or decide the question as to the right of a simple contract creditor to proceed in a federal court of equity under the authority conferred by the state statute on the state court of chancery, or the question as to the right of the complainant in the receivership suit, as a lien creditor, to appeal by such a bill to the general equity jurisdiction of the Circuit Court.

As the court below had jurisdiction of the case on the grounds we have indicated, and as it now appears that the interlocutory decrees appealed from are right in themselves, we do not feel called upon to question the regularity of the proceedings anterior thereto; but we think that in the further progress of the case, the method of procedure should be that of the federal courts, with such modification only as may be made "without violence to principle," and as may be found to be requisite to adapt them to the efficient adjudication of the right created by the New Jersey statute.

This being so, the question remains, whether the orders or decrees of the court below, which were the subject-matters of the three appeals before us, were appealable. The act of Congress of March 3, 1891, c. 517, in section 6, cl. 1, 26 Stat. 828 [U. S. Comp. St. 1901, p. 549], provides that "the Circuit Courts of Appeal established by this act shall exercise appellate jurisdiction to review, by appeal or by writ of error, final decisions in the District Court and the existing Circuit Courts, in all cases other than those provided for in the preceding section of this act, unless otherwise provided by law." Neither of the appeals before us are from "final decisions" in the court below in the case before it, as those words are usually understood. An appeal from such a final decision can only be taken by an original party to the suit, or by one who has been made so by express order

of the court for that purpose, or by a legal representative of such, or by one whose privity in estate, title or interest is disclosed by the record. These appeals, however, as hereinbefore set forth, are from orders of the court below, dismissing, as to the first and third appeals, petitions of intervention by the appellant, and as to the second appeal, from the dismissal of a petition of appellant, appealing to the court below from the decision of the receivers not to allow his claim as a bondholder of the Asphalt Company of America. These orders or decrees of the court below are not on their face appealable. The appellant did not obtain the status of a party in the suit below. On the contrary, the very orders appealed from denied him that status. Such orders are not final decisions, in the sense of the statute, and are within the discretion of the court making them, unless it shall affirmatively appear that the petition of intervention was for the purpose of enforcing an individual right of the petitioner, for the assertion of which there is no other remedy, and which will be entirely lost if intervention is denied. If, for instance, a fund is to be distributed by the court in a suit then before it, the denial of a petition to intervene, of one who claims the right to participate in the distribution, by reason of a title distinct and apart from all other individuals or classes to be affected by the decree, would be a final decree as to such petitioner, for the reasons that his claim of right would be finally disposed of and lost by such denial. The petition to intervene in such case is of right, and not addressed merely to the discretion of the court. In Credits Com. Co. v. U. S., 177 U. S. 311, 315, 20 Sup. Ct. 636, 44 L. Ed. 782, the Supreme Court quote and adopt the language of the Circuit Court of Appeals in the case then before it, as follows:

"When such an action is taken, that is to say, when leave to intervene in an equity case is asked and refused, the rule, so far as we are aware, is well settled that the order thus made denying leave to intervene is not regarded as a final determination of the merits of the claim on which the intervention is based, but leaves the petitioner at full liberty to assert his rights in any other appropriate form of proceeding. Such an order not only lacks the finality which is necessary to support an appeal, but it is usually said of it that it cannot be reviewed, because it merely involves an exercise of the discretionary powers of the trial court. * * * It is doubtless true that cases may arise where the denial of a third party to intervene therein would be a practical denial of certain relief to which the intervenor is fairly entitled, and which he can only obtain by an intervention. Cases of this sort are those where there is a fund in court undergoing administration to which a third party asserts some right which will be lost in the event that he is not allowed to intervene before the fund is dissipated. In such cases an order denying leave to intervene is not discretionary with the chancellor, and will generally furnish the basis for an appeal, since it finally disposes of the intervenor's claim by denying him all right to relief."

The general rule, however, is, as stated by the Circuit Court of Appeals, in Hamlin v. Toledo, St. L. & K. C. R. R. Co., 78 Fed. 665, 24 C. C. A. 272, 36 L. R. A. 826:

"The allowance or denial of the application of a stranger to be admitted as a party defendant to a pending suit in equity, rests in the sound discretion of the chancellor. The denial of such an application is not such a final decree as is the subject of appeal. * * * Such an application is a mere motion in the case, made by one not a party, and is not of itself an independent suit in equity appealable here."

Ex parte Cutting, 94 U. S. 14, 22, 24 L. Ed. 49.

The application to intervene, in both the first and third appeals, was broadly upon the ground that the party by whom the interests of the intervener should be represented, (in the one case the Land Title & Trust Company, trustee, and in the other the receivers) was not representing such interests properly. No individual or separate interest of the petitioner, which could not otherwise be adjudicated at all, and would therefore be lost if intervention were denied, was presented in the court below in either of the petitions which are the subjects of the first and third appeals. If the trustee and the receivers act honestly and in good faith, the rights of the appellant are protected. The trustee has important interests committed to him by his cestuis que trustent in the litigation before the court, and the court was right, both as to the trustee and the receivers, in exercising its discretion to protect them from interference, in the carrying on of the litigation and the administration of the funds in hand, as attempted by appellant's petitions for intervention. If the trustee had acted in bad faith, or fraudulently, it was open to the appellant to proceed by original bill, and if the receivers have been guilty of malfeasance in office, the proper remedy is an application to the court below by the appellant or other party in interest, for their removal and the substitution of others.

The second appeal before us, as already fully stated, is from the decision of the court below, refusing to entertain an appeal from the decision of the receivers, not to allow the appellant to prove his claim as a certificate holder, having already had proof made by the trustee of its claim representing the whole issue of collateral gold certificates, including, of course, that of the appellant. It is to be borne in mind that the collateral gold certificates issued under the agreement of July 15, 1899, do not certify debts and obligations of the Asphalt Company of America direct to the certificate holder, but are a declaration by the Land Title & Trust Company, to whom the said asphalt company has transferred its assets and securities, that it holds the same in trust to pay to the holder of the certificates his proportionate share of the income collected on such securities, and for the ultimate collection and payment to him of the principal amount named therein, so that technically specific holders of such certificates cannot claim as creditors of the Asphalt Company of America, excepting through their trustee. It is not easy to perceive the exact object of the appellant in this matter, unless it be in some way to compel all certificate holders to make proof of their individual certificates, and require the receivers to discriminate against such holders of the same as appellant alleges were guilty of some complicity in an alleged conspiracy or other wrongdoing, as set forth in his other appeals, and thus accomplish an intervention indirectly, which had been denied him by the court upon his petitions. As we have before said, no individual right of the plaintiff is finally disposed of and lost by the refusal of the court below to entertain his appeal. As said by counsel for the receiver, the court chose to direct the receiver to receive proofs of certain claims, it having determined the status of all claimants in the appellant's class, after a reference to a master, and having fixed their

amount, as appears by paragraph 5 of the decree. When called upon by the appellant, upon appeal from the receiver's decision not specifically allowing his claim, the court interpreted its own decree, pursuant to which the receiver acted, as making unnecessary the allowance of the claim by the appellant. If such discrimination between holders of the certificates is necessary to a due administration of the funds in possession of the court, the receivers can be directed to make the proper inquisition after proof of the whole indebtedness is made, as well as prior thereto. The whole matter of appellant's appeal in the court below from the receiver's decision was addressed to the discretion of the court, and the decision of the court below is clearly not appealable.

For the reasons stated, we are of opinion that the three appeals must be dismissed.